Marie **MILLER** and Jeanette M. Edelblute, Appellees,

v.

**EAST GEORGIA MOTORS, INC.,** a corporation, Appellant.

No. 8523.

United States Court of Appeals
Fourth Circuit.

Argued March 30, 1962.

Decided May 19, 1962.

----

Harold A. Mouzon, Charleston, S. C. (Moore & Mouzon, Charleston, S. C., on brief), for appellant.

H. Wayne Unger, Walterboro, S. C., and Walton J. McLeod, Jr., (Jefferies, McLeod, Unger & Fraser, Walterboro, S. C., on brief), for appellees.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

PER CURIAM.

In these two actions for damages for personal injuries, suffered when the automobile in which they were passengers ran off the highway, the District Court accepted the plaintiffs' testimonial version of the facts upon which they sought to establish the liability of the defendant, though their testimonial version of those facts was contradicted by the prior recorded statements of the plaintiffs themselves, by the pretrial deposition of the driver of the automobile, the father of one of the plaintiffs, and was uncorroborated by the other passenger in the vehicle, the wife of the driver and mother of one of the plaintiffs. We think the general findings of the District Court, based upon the thoroughly discredited testimony of the plaintiffs, were clearly erroneous, and that the judgment based upon those findings cannot stand.

At the trial, the plaintiffs sought to establish that they had obtained a used car from a dealer in Savannah, Georgia, that one of them was considering purchasing the automobile, and, with the permission of the dealer, they went on a trip of substantial length into South Carolina. They testified that the accident was caused by a defective brake, notice of which they had earlier brought home to the defendant. The brake, they said, caused the left front wheel to lock, with the result that the driver lost control of the vehicle, so that it ran off the left hand side of the road and crashed into a stump.

In their recorded statements, made several years before the trial and within a few months after the accident, they said they had no idea what caused the accident, for each was asleep at the time. They had not notified the defendant of any defect in the brakes and they did not even claim that they had obtained permission of the defendant to take the defendant's automobile on the journey. Moreover, the driver of the car, who was, himself, injured in the accident, testified in his pretrial deposition that there was no indication of any defect in the brakes, that he was not attempting to apply them at the time (contrary to the trial testimony of the plaintiffs), and that he did not know what caused him to lose control of the vehicle.[1]

----

1. As will presently appear, three of the occupants of the vehicle, including the driver, had had little, if any, sleep for three nights. The accident occurred in the early morning hours of the third night. In her pretrial statement, each of the plaintiffs said she was asleep at the time. Mrs. Miller said she turned the

The plaintiff, Florence Marie Miller, had been working at Hunter Air Force Base near Savannah, Georgia. At the conclusion of a visit to her home in Altoona, Pennsylvania, her mother and father,[2] Mr. and Mrs. Earl S. Laird, undertook to drive her in the father's automobile from Altoona to Savannah. They left Altoona late in the evening on May 17, 1955. They traveled the remainder of that night and most of the next day. They had trouble with the car in North Carolina, which the father attempted to repair. They then resumed their journey. Sometime during the night of May 18–19, at a point north of Walterboro, South Carolina, further serious engine trouble developed, and they could proceed no farther. They slept in the car through the remaining hours of that night, and, on the morning of May 19, 1955, Mrs. Miller and her mother each "hitchhiked" the remainder of their way to Savannah. The father, employing the same mode of travel, followed later.

According to her pretrial statement, during the afternoon or evening of May 19, 1955, after her arrival in Savannah, Mrs. Miller went to a used car lot operated by the defendant where she expressed interest in the purchase of an automobile. She was given permission to try and test a 1950 model Ford and to retain possession of it until the afternoon of the 20th after she completed her day's work at Hunter Air Force Base. She told the defendant's salesman of the breakdown of her father's automobile in explanation of her purchase of another vehicle, but she would not say that she had told him of her purpose to use the borrowed vehicle to make a round trip of more than two hundred miles to retrieve some tools her father had left in his abandoned automobile.

After driving to her residence in Savannah Beach, Mrs. Miller, her mother and father and Miss Edelblute,[3] the other plaintiff, decided that they would drive in the borrowed automobile to the point where Mr. Laird's automobile had been left north of Walterboro, South Carolina, for the purpose of picking up some tools which Mr. Laird had left in his locked automobile. With Mrs. Miller driving the borrowed vehicle, they left Savannah Beach in the early evening and drove through Savannah, Georgia and on to Walterboro, South Carolina and beyond, where they picked up Mr. Laird's tools and made an effort to tow Mr. Laird's car. Abandoning the towing effort, they set about on their return journey. After driving through Walterboro, Mrs. Miller surrendered the role of driver to her father. She did so, she said, because she was so tired and sleepy she felt it unsafe for her to continue. She had to work the next day and wished to get some sleep.

In her pretrial statement, taken in question and answer form by a court reporter, Mrs. Miller stated that on the trip north that evening she noticed that the brakes were pulling to the left. She said she told her father of the brakes when she turned the wheel over to him. She did nothing else about it.

Miss Edelblute, in her pretrial statement, said she noticed nothing wrong with the brakes and heard no mention of them. Otherwise, Miss Edelblute's statement, taken while she was still hospitalized in Altoona, Pennsylvania, is quite consistent with Mrs. Miller's statement in

driving over to her father because she was so tired and sleepy, she felt it unsafe for her to drive. The driver testified that all other occupants of the car were asleep at the time, and it is a reasonable probability that he, too, fell asleep.

2. Mr. Laird is actually her stepfather. In a pretrial statement and in her testimony, Mrs. Miller explained the relationship, but, otherwise, consistently referred to him simply as her father. We, conscious of the actual relationship, for convenience, adopt her method of referring to him.

3. Miss Edelblute was also a native of Altoona, Pennsylvania. She had received practical training in pediatric nursing. She was seeking employment in a Savannah hospital, and meanwhile, was living with her friend, Mrs. Miller.

Savannah, Georgia, as recorded by the reporter.

Each of the plaintiffs in her pretrial statement repeatedly and emphatically said that she was asleep at the time of the accident and had no knowledge of its cause or its circumstances.

In his pretrial deposition, Mr. Laird said that he first saw the borrowed vehicle about 8:00 o'clock in the evening on May 19, 1955, and his testimony, in general, is in agreement with the pretrial statements of his daughter and her friend regarding the trip north and the return to the point of the accident. He testified that, at the time of the accident, his wife, his daughter and Miss Edelblute were all asleep. He testified that he had heard of no defect in the brakes and had noticed nothing wrong with them because he had no occasion to use them. He was not attempting to apply the brakes at the time of the accident and did not know what its cause. He testified he noticed no hole in the road, but there may have been one.

Both Mr. and Mrs. Laird suffered substantial injuries in the accident. If someone was liable to respond to them for their damages, Mr. Laird's interest was to testify to facts which would support a claim of liability. He had experience in automobile mechanics, because of which Mrs. Miller said she was particularly anxious to have him test the car she contemplated purchasing. If the brakes had been operating unsatisfactorily, it would be expected that he would have noticed it and could have testified to the fact.

At this point it is appropriate to observe that the pretrial statements of each of the plaintiffs and the pretrial deposition of Mr. Laird showed no basis for any action for damages against the defendant, the owner of the borrowed automobile. There was no claim that the accident was caused by faulty brakes. If there was a defect in the brakes, there was no basis of a claim that the defendant knew of it, or could have found it by a reasonable inspection. There was not even a claim that the use of the vehicle at the time was within the limits of their permissive use of it.

At the trial, however, the plaintiffs undertook to overcome these fatal defects in their legal position. The undertaking required bald contradiction of their earlier statements.

At the trial, the plaintiffs testified there was not one visit to the defendant's lot, but two. Mrs. Miller testified that on the way to Savannah Beach in the defendant's automobile, she noticed that it pulled to the left each time she applied the brakes. By telephone, she reported the fact to one of the defendant's salesmen. She, her father, Miss Edelblute, the other plaintiff, and Mrs. Corine Richardson, in whose home both of the plaintiffs resided, then drove to Savannah and to the defendant's lot. There the defendant's salesman drove the car away, but returned after a short while and redelivered the automobile to her. The salesman reported that the brakes were then all right.

Thus assured, Mrs. Miller testified, she drove her father and her friends back to Savannah Beach, and found that the brakes were working properly. Later, she, her mother, her father and Miss Edelblute again drove to Savannah and on into South Carolina on their tragic journey.

As to the trip to the defendant's lot, the complaint about the brakes and their presumptive repair, Miss Edelblute's testimony was a precise corroboration of Mrs. Miller's. She said that on the trip into Savannah, she noticed the car pulling to the left each time Mrs. Miller applied the brakes.

They did not call as a witness their friend, Mrs. Richardson, who, they said, accompanied them on the trip to have the brakes repaired. Their story of this trip is contradicted by the pretrial deposition of Mrs. Miller's father, for he mentioned no such trip; he never noticed any fault in the operation of the brakes or heard any complaint about them; he nev-

er saw the automobile until 8:00 o'clock that evening.[4]

As to the immediate cause of the collision, each plaintiff testified that she was awake at the time, alert and observant. They overtook another vehicle, they said, and Mr. Laird applied the brakes to reduce speed. There was a sudden thump or jerk and the vehicle swerved to the left. Running on the left hand shoulder of the road, there was a second thump or jerk. The automobile again careened to the left and crashed into a stump.

They sought to support their theory of causation by the testimony of the manager of a garage in Walterboro to which the wrecked vehicle was removed after the collision. He said the left front wheel was frozen. He saw evidence of an old, slow leakage of fluid which, in his opinion, caused the wheel to lock.

A witness for the defendant testified that he examined the vehicle after its removal to a junk yard in Savannah. The left front wheel would not turn because portions of the bumper had been driven through the tire and held it in place. When the bumper was removed, he said, the wheel turned freely.

As we have noticed, the plaintiffs' testimonial version of the occurrences immediately preceding the collision, was contradicted by their emphatic and repeated declarations in their pretrial statements and by the deposition of the driver, Mr. Laird. It was uncorroborated by Mrs. Laird, the fourth occupant of the automobile. Mrs. Miller did not offer her mother as a witness, and, apparently, no one took her pretrial deposition.

By a court reporter of Savannah, Georgia, and a transcript prepared by him, the defendant offered evidence that Mrs. Miller was interviewed by a Mr. Akrey in the presence of the court reported on June 17, 1955, and that Akrey's questions at that time and Mrs. Miller's answers were shown by the transcript as prepared by the court reporter and received in evidence. In that transcript, Mrs. Miller is recorded as having said that she returned to work on the preceding Monday. Subsequently, however, Mrs. Miller was again hospitalized and underwent operations for the purpose of rebuilding the bony structure of her nose. In the summer of 1955, she suffered a "nervous breakdown" and was confined for a period in a state hospital in Pennsylvania. She was subjected to electric shock treatments and drugs, which obliterated her memory of the events of the period. For an extended period of time, she was unaware even of the fact that she was the mother of a child and had been engaged in a contest with her estranged husband over the child's custody. Still later, according to her trial testimony, with psychiatric assistance, her memory of the accident and the events preceding it was restored, but she did not recall having been interviewed by Mr. Akrey in the presence of a court reporter in June 1955. She would not say that she had not been so interviewed, she would only say that she did not remember it, although, at one point, she did say that she did remember that she had been very cooperative.[5]

A Mr. Rock testified that he interviewed Miss Edelblute in the hospital at

---

4. The plaintiffs' testimony was also contradicted by the defendant's salesmen, at least one of whom was a friend of Mrs. Richardson's and with whom Mrs. Miller chatted sociably as an acquaintance.

5. Mrs. Miller testified:
"What I am remembering is what the psychiatrists have brought back and the things that have been brought up through my series of tests at the State Hospital. I am remembering because they made me remember to get better. I don't remember giving any statement to anybody. I don't remember all this. Apparently the

psychiatrist evaded the fact to ask me if I made a statement. I don't know. But I don't remember making any statement. I can't imagine anybody getting that close to me. I have letters from my attorney that I didn't even know what was happening, to December—I don't know—'57 or so. I don't know. I didn't talk with the policeman. I don't remember talking to anybody about this accident, ever. I don't remember talking to anyone until my bills got so heavy I needed an attorney to represent me to get out of the hospital, and I called an attorney to get a release. I don't remember

Altoona, Pennsylvania. One of Miss Edelblute's limbs was in traction,[6] but she was propped up in bed at the time, writing letters. Mr. Rock testified that, after learning from Miss Edelblute what she knew of the accident and the events preceding it, he wrote out a statement of the information he had obtained from her. Thereafter, Miss Edelblute, in her own handwriting added the words at the end, "I have read and understand the above 3½ pages and they are true to the best of my knowledge," after which she signed herself, "Jeanette M. Edelblute" and placed her initials on each of the three preceding pages.

When, at the trial in July 1961, Miss Edelblute was confronted with the statement of June 23, 1955, she, at first, unequivocally, emphatically and repeatedly identified the signature as hers. She said that the lines immediately preceding her signature appeared to be in her handwriting, as were the initials on each page. After she had been given an opportunity to read and study the entire statement, she said the initials upon the first three pages were not hers. She became uncertain that the lines preceding the signature were in her handwriting, and then denied that they were. She continued to acknowledge that the signature at the end of the statement appeared to be hers, but she contended that she could not have written it upon that particular piece of paper, for, she said, she had not seen that particular piece of paper until it was presented to her at the trial. She also stated that, while hospitalized in Altoona, she was subject to a number of "blackouts," though, otherwise, her medical history, extensively developed in the record, contains no reference to blackouts.

The authenticity of the Miller and Edelblute statements, taken in June 1955, was not impaired by anything that occurred at the trial more than six years later. Mrs. Miller did not remember the interview, but her memory of many events of the period had been obliterated by the medical treatment of her emotional disorder. Miss Edelblute offered no explanation of how her signature could have been affixed to the paper, if she did not put it there. She simply contended that, because the statement was so inconsistent with her trial testimony, she could not have seen it earlier and could not have signed it.

The plaintiffs' trial version of the facts is not only contradicted by the 1955 statements, but the Miller and Edelblute statements of 1955 are stoutly corroborated by the deposition testimony of Mr. Laird, the driver of the vehicle. The veracity of Mr. Laird's deposition testimony and the content of the Miller and Edelblute statements are supported by Mr. Laird's interest in a recovery of damages for his own injuries and those of his wife, if the true facts would form a basis for the imposition of liability upon the owner of the car. The veracity of the pretrial version of the interested parties of the crucial facts is further supported by the failure of the plaintiffs to call Mrs. Laird and Mrs. Richardson to corroborate their very different trial version of the facts.

Under all of these circumstances, we think that the plaintiffs' trial testimony, as to the crucial facts, so self-serving as it was but so thoroughly contradicted out of their own mouths and that of the interested father, and completely uncorroborated by witnesses whom they would be expected to produce if there was any truth in their trial testimony, was completely discredited. When the trial judge

just remember that I got a car. What I all these operations and everything. I testified yesterday, that I went to a Car Lot to buy a car and I went back. Only the things that I had to remember, that I have to remember, why this accident happened and what was causing—what was the cause of the accident, and how seriously we were hurt. I don't know. I can't remember all those things. * * * All I know is I didn't even know I had a son. I just know that. I didn't even file

for custody of my son until '58. I didn't even remember him.

6. Miss Edelblute suffered many fractures. Long hospitalization led to other complications, occasioning later hospitalization and operations. Her injuries and those of Mrs. Miller were extremely severe. The injuries of Mr. and Mrs. Laird were less extensive than those suffered by the two plaintiffs, but were substantial.

**494**

ignored the compelling contradictions and the absence of available corroboration and made general findings of fact consistent with the plaintiffs' trial version of the occurrences, we think he fell into plain error. On the whole record, the pretrial version of the occurrence, apparently concurred in by all of the injured parties, including the two plaintiffs, was so overwhelmingly established that general findings, based upon the wholly inconsistent and opportunistic trial testimony, must be held to be clearly erroneous. Findings based upon obvious after thoughts, fabricated for the service of the plaintiffs' financial interest in the recovery of large sums of money as damages, should not be allowed to stand.

The judgment of the District Court, based upon its erroneous findings, will be reversed and judgment will be entered for the defendant.

Reversed.